LINDA R. SKINNER,        )
JAMES E. SKINNER,       )
                             )
      Plaintiffs,     )
                             )
      v.                )     No: 3:09 CV 394
                             )
METROPOLITAN LIFE INSURANCE )
COMPANY d/b/a METLIFE,    )
                             )
      Defendant.    )

## OPINION AND ORDER

Plaintiffs Linda R. Skinner and James E. Skinner filed a complaint against defendant Metropolitan Life Insurance Company ("MetLife"). (DE # 1.) Plaintiff Linda R. Skinner ("Linda") states that she and MetLife entered into a life insurance policy which provided that she would no longer need to pay premiums if she became totally disabled. (*Id.* ¶ 4.) Linda alleges that although she submitted proof of her total disability, MetLife refused to waive her premiums. (*Id.* ¶ 12.) Thus, Linda is proceeding against MetLife with claims of breach of contract, bad faith, fraud, and intentional infliction of emotional distress. (*Id.* ¶¶ 15-27.) Plaintiff James E. Skinner ("James") is bringing a claim of loss of consortium. (*Id.* ¶¶ 18-30.)

This matter is currently before the court on MetLife's motion to dismiss pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) filed on October 2, 2009. (DE # 7.) The Skinners filed a response (DE # 10), and MetLife filed a reply. (DE # 12.) The Skinners

filed a motion to strike MetLife's reply on the basis that it was filed after the deadline established by the RULE 7.1 of the LOCAL RULES OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA (DE # 13 at 1-2), and MetLife filed a response. This motion is also currently before the court.

**<u>Motion to Strike Defendant's Reply Brief</u>**

The Skinners move to strike MetLife's reply brief because it was filed on October 30, 2009, fifteen days after the plaintiffs filed their response brief on October 15, 2009. (DE # 13 at 1.) RULE 7.1 of the LOCAL RULES OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA states that once a motion is filed, the adverse party has fourteen days to file a response. Once the response is filed, the moving party has seven days after service of the response to file a reply. The Skinners argue that MetLife violated the filing deadline in LOCAL RULE 7.1 by filing its reply brief fifteen days after service of the response without having requested an extension of time. (DE # 13 at 2.)

MetLife argues that pursuant to FEDERAL RULE OF CIVIL PROCEDURE 6(a)(2), as it stood before it was amended effective December 1, 2009, it had until October 29, 2009 to respond. (DE # 14 at 1.) For filings made before December 1, 2009, RULE 6(a)(2), which applies to local court rules, states that intermediate Saturdays, Sundays, and legal holidays, are not counted towards time periods of less than eleven days. FED. R. CIV. P. 6(a)(2) (2007) (amended 2009). MetLife first states that the Skinners filed their response brief on October 15, 2009, but it later states that the response brief was

filed on October 22, 2009, and it calculates the filing deadline from that time. (DE 14 # at 1-2.) MetLife argues that the deadline to file its reply was October 29, 2009 and it miscalendered the deadline for the day later, October 30, 2009, at which time it filed its reply. (*Id.* at 2.) The court finds that the response was actually filed on October 15, 2009, and seven days later, exclusive of Saturdays and Sundays, was October 26, 2009. RULE 6(d) provides for an additional three days to be added to the time period after certain kinds of service, including sending a document by electronic means as was done here. FED R. CIV. P. 6(d); FED. R. CIV. P. 5(b)(2)(E). Even with the October 15, 2009 filing date, MetLife had until October 29 to file its reply brief. Thus it filed its reply brief one day late.

Under RULE 6(b), on a party's motion the court can extend the time for filing a reply after a deadline has expired if the party "failed to act because of excusable neglect." In its response to the Skinners' motion to strike, MetLife asks for leave to file its reply brief belatedly. (DE 14 # at 2.) In determining whether a delay was caused by excusable neglect, courts can consider the length of the delay and whether it resulted in prejudice to the other party. *Bleitner v. Welborn*, 15 F.3d 652, 654 (7th Cir. 1994). Here the one day delay was minimal. MetLife argues that the Skinners did not suffer any prejudice from the delay (*id.*) and the Skinners have not made any contrary assertions. The court agrees that no prejudice resulted to the Skinners from the short delay in filing the reply brief.

Thus, MetLife's motion for leave to file its reply brief belatedly (DE # 14) is **GRANTED** and the Skinners' motion to strike (DE # 13) is **DENIED**.

## Motion to Dismiss

### I.     ALLEGATIONS OF PLAINTIFFS' COMPLAINT

On October 20, 1994, MetLife issued a whole life insurance policy to Linda Skinner. (DE # 1 ¶ 2.) The policy included a section labeled "Rider Disability Waiver of Premiums Benefits" ("the rider"). (*Id.*) The rider stated that if the insured, Linda Skinner, became "totally disabled for a continuous period of at least 6 months," she would not have to pay the premiums on her policy. (*Id.*) The insured was required to pay all premiums until the claim was approved and then the premiums would be refunded after approval. (*Id.*)

The rider defined "total disability" as "an incapacity which: 1. Results from bodily injury or disease; and 2. Prevents the insured from doing the substantial and material acts of any work for income or profit. . ." (*Id.* ¶ 4.) The rider required written notice and proof that the total disability had existed continuously for six months. (*Id.* ¶ 4.) The policy stated that, "[a]s part of any proof we may require, at our expense, medical examinations of the insured by physicians we name." (*Id.*)

Linda's complaint alleges that in October, 2008, the Social Security Administration ("SSA") sent her a "Notice of Award" stating that she was entitled to monthly disability benefits beginning in June, 2008, when she was 63 years-old. (*Id.* ¶ 6.)

4

Nothing in the complaint indicates the nature of Linda's total disability.[1] Linda alleges that in late November or early December, 2008, she called MetLife and advised them of her disability status. (*Id.* ¶ *7.*) On January 13, 2009, MetLife sent Linda a letter and forms related to her claim for waiver of premium benefits. (*Id.* ¶ 8.) Linda alleges that she filled out all of the forms and produced documentation of her disability status. (*Id.*)

On January 22, 2009, MetLife sent Linda a letter stating that she had indicated that she was totally disabled as of June, 2008, and it needed medical proof of the total disability from that time to the date of the letter. (*Id.* ¶ 9.) The letter stated that "MetLife does not accept Social Security, Worker's Compensation or any outside agency alone as proof of disability." (*Id.*) The letter also asked Linda to "[p]lease have the physician who has treated you during this period [June, 2008 to January 22, 2009] fully complete the enclosed medical statement." (*Id.*)

On February 20, 2009, MetLife sent Linda another letter which stated that it received a letter from her physician regarding the claim for disability benefits, but he indicated that he had not seen her since 2007. (*Id.* ¶ 11.) MetLife's letter stated that it needed medical proof of total disability from June, 2008 to February, 2009. It also stated, "[p]lease have a physician, who has treated you during this period, complete the

---

[1] In her brief in opposition to the motion to dismiss, Linda states that she suffers from a number of health problems "including but not limited to heart problems" and that her physician determined in 2007 that she was permanently disabled and he could no longer provide any medical procedures to improve her condition. (DE # 11 at 1.) These statements are only provided for explanation and were not relied upon by the court in ruling on the motion to dismiss.

enclosed form in full and return it to us in the enclosed envelope." (*Id.*) Linda makes no factual allegations as to what she did, if anything, after receiving this letter.

Linda alleges that MetLife "has refused and continues to refuse to waive insurance premiums pursuant" to the rider. (*Id.* ¶ 12.) She states generally that MetLife did this "despite [her] full cooperation and satisfaction of all her obligations under the [p]olicy." (*Id.*) She claims that because of this she has been forced to pay all premiums to date and will be forced to pay in the future, even though she has a total disability. (*Id.* ¶ 13.)

## II. STANDARD OF REVIEW

In considering a motion to dismiss under FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) the court accepts all of "the complaint's well-pleaded allegations as true" and draws "all favorable inferences for the plaintiff." *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006). A court can dismiss a claim of relief under RULE 12(b)(6) for a "failure to state a claim upon which relief can be granted." The complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). The complaint must go beyond providing "labels and conclusions," and "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted).

To do this, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. To meet the plausibility standard, a plaintiff must "plead factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). When the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief'" as required by RULE 8(a)(2). *Id.* at 1950.

The plaintiff cannot just "give a threadbare recitation of the elements of a claim without factual support." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009). Still, the plaintiff "must provide 'only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.'" *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (citing *Tamayo v. Blagovich*, 526 F.3d 1081, 1083 (7th Cir. 2008)).

Pursuant to FEDERAL RULE OF CIVIL PROCEDURE 9(b), plaintiffs must plead allegations of fraud with particularity, meaning that they must specify the "who, what, when, where, and how" of the fraudulent act. *Arazie v. Mullane,* 2 F.3d 1456, 1465 (7th Cir. 1993). Still, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

## III.    ANALYSIS

### A.    *Breach of Contract*

MetLife argues that Linda's breach of contract claim should be dismissed because her complaint shows that she failed to satisfy the conditions precedent to MetLife's performance under the rider. (DE # 8 at 4.) It argues that "Indiana courts

recognize the necessity of complying with the requirements of a provision of a policy requiring proof of disability as a condition precedent to the liability of the insurer" and because Linda had not proven her disability, her claim should be dismissed. (DE # 8 at 5 (quoting *Jordan v. John Hancock Mut. Life Ins. Co. v. Frisch,* 222 F.2d 210, 214 (7th Cir. 1955)).) However, for the following reasons the court finds that Linda's claim of breach of contract should not be dismissed.

First, MetLife relies primarily on cases that employed the argument stated above to dispose of a plaintiff's claims at the summary judgment stage, not at the motion to dismiss stage. (*See* DE # 8 at 5 (citing *Standard Mut. Ins. Co. v. Boyd*, 452 N.E.2d 1074 (Ind. Ct. App. 1983) and *Morris v. Econ. Fire and Cas. Co.*, 848 N.E.2d 852 (Ind. Ct. App. 1946)).) At the pleading stage, Linda is not required to "prove" that she had a total disability as defined by the rider.

Second, the facts pleaded in Linda's complaint, taken as true, can support an inference that she met the conditions of the rider. Even if the terms of the contract are not ambiguous, at this stage, Linda does not have to prove that she met her obligations under the contract. She only has to have made factual allegations that could plausibly support a conclusion that she met the terms of the contract while MetLife breached them.

MetLife correctly points out that Linda's statement that she gave "full cooperation and satisfaction of all of her obligations under the [p]olicy," is a legal conclusion which the court need not take as true and which cannot support a claim

without underlying factual allegations. *Iqbal*, 129 S. Ct. at 1949-50; *Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir. 2009) ("in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements"). Still in addition to this statement, Linda makes factual allegations that she proved her disability status by informing MetLife of the SSA's determination and by submitting a statement from her doctor. (DE # 1 ¶ 6-11.) From these factual allegations the court can conceive of plausible scenarios that would support a claim for breach of contract.

MetLife argues that Linda's breach of contract claim fails because MetLife was not bound by the SSA's determination that she was disabled. (DE # 12 at 2.) Once again, this argument is more appropriate for the summary judgment stage. In fact, the cases to which MetLife cites for this proposition all dealt with cases at the summary judgment or trial stages (also most of the cases dealt with denial of disability benefits under ERISA). *See Block v. Pitney Bowes Inc.*, 952 F.2d 1450, 1456 (D.C. Cir. 1992) (affirming the district court's grant of summary judgment to defendants in part on the basis that the SSA's determination that the plaintiff was disabled did not show that the decision of the administrators of his employee disability plan to not give him disability benefits was unreasonable when the SSA reviewed documents not available to the administrators); *Smith v. Metro. Life Ins. Co.*, 344 F. Supp. 2d 696, 703 (D. Col. 2004) (rejecting at the summary judgment stage plaintiff's argument that the insurer should have given more weight to a determination of the SSA because the SSA determination was not binding

on the insurer); *Wheatley v. Am. United Life Ins. Co.*, 792 N.E.2d 927, 932

(Ind. Ct. App. 2003) (reviewing the trial court's ruling at a bench trial and finding that

an insurance company is not bound by the determination of the SSA and that to make

any use of an SSA determination, the claimant must show that the insurance

administrator had all of the information that the SSA had in making its determination);

*Coker v. Metro. Life Ins. Co.*, 281 F.3d 793, 798 (8th Cir. 2002) (stating at the summary

judgment stage that the SSA's determination that the plaintiff was disabled did not

require the defendant to reach the same conclusion).

While MetLife was not bound by the SSA's determination, it is plausible that the

SSA's determination could have been used to prove Linda's disability status for

purposes of the rider. *See Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir.1994)

(MetLife was not bound by the SSA's determination when it did not have the SSA file

before it), *disapproved of in part on other grounds by Diaz v. Prudential Ins. Co. of Am.*,

424 F.3d 635 (7th Cir. 2005); *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*,

390 F. Supp. 1040, 1046 (7th Cir. 2004) (stating that SSA determinations are instructive

but not dispositive). Thus, while the SSA determination was not binding on MetLife,

factual allegations related to it are not completely irrelevant. SSA determinations may

still be instructive even when, as MetLife argues here, the definition of disability under

a plan or policy differs from that used by the SSA. *See Ladd v. ITT Corp.*, 148 F.3d 753,

755 (7th Cir. 1998); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 695 (7th Cir. 1993). Also,

at this early stage, it is not yet clear that MetLife did not have the same information

before it that the SSA did. Thus, while MetLife's arguments may be successful at a later stage in the litigation, they are premature here where the plaintiff is not yet required to provide proof of her claims.

Third, the factual allegations in Linda's complaint could plausibly show that there was an ambiguity in the contract. For example, Linda points to the rider's statement that "[a]s part of any proof [of disability] we may require, at our expense, medical examinations of the insured by physicians we name." (DE # 1 at ¶ 4.) She argues that this provision meant that MetLife was required to pay for examinations that it requested. (*Id.* at ¶ 20.) At this stage, this allegation could give rise to an inference that there was an ambiguity in the contract.

As plaintiffs point out, under Indiana law, the language of an insurance policy is ambiguous if it is susceptible to more than one reasonable interpretation. *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 151 (7th Cir. 1994). When an insurance policy is ambiguous, ambiguities are construed in favor of the insured. *Id.* Although the court expresses no opinion as to whether there were ambiguities in the contract, the possibility of ambiguities in the contract could support a plausible claim of breach of contract. In the example above, if the contract language is taken to mean that MetLife was required to pay for examinations needed to prove disability, then MetLife may have breached the contract. Because the complaint sufficiently pleads breach of contract, MetLife's motion to dismiss the breach of contract claim is **DENIED**.

B.      *Bad Faith*

Linda's next claim, which MetLife asks the court to dismiss, is that MetLife acted in bad faith towards her, violating "its implied covenant of good faith and fair dealing in the performance of its duties which it assumed under the [p]olicy." (DE # 1 ¶ 2-3.) MetLife argues that the complaint itself shows that MetLife satisfied its obligations under the policy and acted in good faith. (DE # 8 at 7.) It argues that a claim of bad faith cannot be based on a correct application of an insurance policy and that a dispute over the meaning of a policy is not enough to show bad faith. (*Id.*) In response, Linda argues that MetLife has committed each of four acts of bad faith recognized by the Supreme Court of Indiana: 1) refusing, without foundation, to pay policy proceeds; 2) causing an unfounded delay in payment; 3) deceiving the insured; and 4) using an unfair advantage to force an insured into settlement of a claim. (DE # 11 at 12) (citing *Worth v. Tamarack Am.*, 47 F. Supp. 2d 1087, 1102 (S.D. Ind. 1999)).)

In Indiana, "there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993). A claim of bad faith exists when the insurer breaches this duty by denying a claim when it knows that there is no rational, principled basis for doing so. *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002). Proof of bad faith exists when there is "clear and convincing evidence which establishes the insurer had knowledge that there was no legitimate basis for denying liability." *Id.* (citing *Ind. Ins. Co. v. Plummer Power Mower & Tool Rental, Inc.*, 590 N.E.2d 1085, 1093 (Ind. Ct. App. 1992)). A finding of bad

faith requires evidence of a state of mind of "conscious wrongdoing" including "dishonest purpose, moral obliquity, furtive design, or ill will." *See Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005) (internal quotation omitted); *Colley v. Ind. Farmers Mut. Ins. Group,* 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998) ("Poor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present.").

Although the scope of the duty of good faith is not precisely defined, the Indiana Supreme Court has identified four actions that can constitute bad faith. *See id.* at 976. As stated above, these are: "(l) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim." *Hickman,* 622 N.E.2d at 519.

Still, a claim for bad faith is not generated by every erroneous denial of an insurance claim. *Id.* at 520. As MetLife points out, insurers may dispute claims in good faith (DE # 8 at 8), and they may even breach a contract without committing an act of bad faith. *Hickman*, 622 N.E.2d at 520. *Cf. CIGNA-INA/Aetna v. Hagerman-Shambaugh*, 473 N.E.2d 1033, 1037 (Ind. Ct. App. 1985) ("Good faith expressions of uncertainty as to coverage do not provide the basis for punitive damage awards against insurers"). Bad faith does not exist when an insurer rests its coverage decision upon a rational basis. *Masonic Temple Ass'n of Crawfordsville v. Ind. Famers Mut. Ins. Co.*, 779 N.E.2d 21, 29-30 (Ind. Ct. Ap. 2002).

Linda's complaint alleges that MetLife "knew that there was no rational, principled basis for denying or otherwise acting unreasonable [sic] with respect to Linda's request to have her premiums waived due to her disability under the terms of the [p]olicy." (DE # 1 ¶ 21.) Linda makes several factual allegations to support this claim. She contends that MetLife, through its agent, Stephen A. Nardoza ("Nardoza") acted unreasonably in one or more respects. (DE # 1 ¶ 20.) Among the unreasonable acts that Linda identifies are: failing to waive the premiums when it became clear that Linda was disabled within the meaning of the policy; failing "to pay for a medical examination of Linda by physicians named by MetLife as required by the [p]olicy"; misrepresenting the terms of the policy by stating that MetLife did not accept a finding of disability from the SSA or any other outside agency alone as proof of disability when the policy did not mention this prohibition; misrepresenting the "terms of the [p]olicy by requiring Linda to pay for a physician to examine her" in order to verify her disability status; "failing to adopt and implement reasonable standards for the prompt investigation of claims"; failing to "affirm coverage relating to the disability premium benefit within a reasonable time" after Linda submitted proof of disability statements; not effectuating "prompt, fair and equitable resolution of Linda's claim when coverage became reasonably clear"; making "deceitful representations to Linda about waiver of the premiums"; and using "an unfair advantage to pressure Linda into forfeiting her rights" to have the premiums waived. (*Id.*)

Linda states that she completed all of MetLife's forms, provided MetLife with a statement by a physician who saw her in 2007, and gave MetLife a copy of the SSA's award of disability from June, 2008. (DE # 11 at 12.) She asserts that if MetLife needed more proof of her disability "it was required to hire a physician of its own choice and make this determination." (*Id.*) Linda alleges that MetLife's agent, Nardoza, denied her request to have her premiums waived even though he "knew that there was no rational, principled basis" for doing so. (DE # 1 at 21.) The complaint alleges that Nardoza "acted with a state of mind reflecting, dishonest purpose, moral obliquity, furtive design or ill will." (*Id.*) It also alleges that MetLife "acted with willful and wonton misconduct, malice, fraud, gross negligence or oppressiveness that was not the result of mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing." (*Id.* at 22.)

While parts of Linda's complaint, such as the statements in the above paragraph, verge on being legal conclusions that can be ignored by the court, bad faith does not need to be pled with particularity and the factual allegations Linda makes could state a plausible claim upon which relief could be granted. Again MetLife's arguments for dismissing this claim would be better taken at a later stage in the litigation. Its motion and reply are peppered with statements like "clear and convincing evidence" and "Linda has not provided medical proof." (DE # 12 at 9; DE # 8 at 8.) She does not need to prove anything at this stage. In a comparable case before the District Court for the Southern District of Indiana, a defendant insurance company argued that a bad faith

claim against it should be dismissed because the conduct involved did not rise to the

level of bad faith as it involved only a good faith dispute about insurance coverage.

*Sanyo Laser Prods., Inc. v. Royal Ins. Co. of Am.*, No. 1:03-cv-1151, 2003 U.S. Dist. LEXIS

20129, at *5-6 (S.D. Ind. Nov. 7, 2003). The court stated, "[w]hile it is true that Indiana

courts have set a high threshold for establishing bad faith, Royal's argument would be

more appropriate at the summary judgment stage than it is on a motion to dismiss."

*Id.* at *13. The court denied the motion to dismiss finding that requiring the plaintiff to

make specific allegations of bad faith and to plead the proper state of mind in the

complaint would be tantamount to applying a heightened or fact pleading standard.

*Id.* at *13-14. *See also United States ex rel. James Cape & Sons Co. v. Am. Home Assurance Co.*,

No. 02 C 1903, 2004 U.S. Dist. LEXIS 24212, at *18 (N.D. Ill. Dec. 2, 2004).

Here, MetLife argues that Linda's bad faith claim should be dismissed because it

"cannot be predicated on the correct application of the insurance policy." (DE # 8 at 7.)

While this argument may be appropriate at the summary judgment stage, *see Estate of*

*Mintz v. Conn. Gen. Life Ins. Co.*, 905 N.E.2d 994, 1000 n. 2 (Ind. 2009), at this stage, Linda

has had no opportunity or obligation to show whether or not MetLife applied the policy

correctly. For the above reasons, MetLife's motion to dismiss the bad faith claim is

**DENIED**.

   C.    *Actual Fraud and Constructive Fraud*

Pursuant to Rule 9(b), allegations of fraud need to be pled with particularity,

though "[m]alice, intent, knowledge, and other conditions of a person's mind may be

alleged generally." For a claim of fraud, the pleader must identify the person who made the misrepresentation; the time, place and content of the misrepresentation; and the way in which the misrepresentation was communicated to the pleader. *Gen. Elec. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir. 1997).

> The elements of actual fraud in Indiana law are:
>
> 1) a material representation of past or existing facts which 2) was false, 3) was made with knowledge or reckless ignorance of its falsity, 4) was made with intent to deceive, 5) was rightfully relied upon by the complaining party, and 6) proximately caused injury to the complaining party.

*Bilimoria Computer Sys., LLC v. Am. Online, Inc.*, 829 N.E.2d 150, 155 (Ind. Ct. App. 2005). A claim of actual fraud "may not be based on representations of future conduct, on broken promises, or on representations of existing intent that are not executed." *Id; see also Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250 (Ind. Ct. App. 1998). *Cf. Mudd v. Ford Motor Co.*, 178 Fed. Appx. 545, 547 (7th Cir. Ind. 2006) ("In some jurisdictions, a statement of a present intention or state of mind will support a claim of actual fraud. But Indiana has explicitly rejected that rule.") (internal quotations and citations omitted).

Based on the factual allegations in the complaint, Linda can prove no set of facts that would allow her to recover for a claim of actual fraud. Linda argues that her claim of fraud should survive because it is "pled with sufficient particularity and because Linda has brought forward alleged misrepresentations by [d]efendant that concern past or existing facts." (DE # 11 at 13.) In support of this, she states:

Defendant promised Linda that it would waive the policy premiums if Linda became disabled. Linda relied on that promise and paid [d]efendant a lot of money in premiums over the years before she became disabled. When Linda became disabled and could no longer become gainfully employed, [d]efendant refused to honor its promise.

(*Id.*)

Linda claims fraud based on future promises, and even she admits that this is not allowed by law. In her complaint, Linda points to some additional alleged misrepresentations. These allegations, as stated above in the court's analysis of the claim of bad faith, were that MetLife misrepresented the terms of the policy by requiring Linda to pay for physician to examine her and by stating that MetLife does not accept SSA determinations alone as proof of disability when the rider does not mention this prohibition. (DE # 1 ¶ 20.) These allegations seem to be attempts by Linda to convert future promises into statements of existing fact because she construes statements made after the policy was created as misrepresenting the promises made within the contract. *See Schafer v. Jeld Wen Doors*, No. 2:07-cv-163, 2007 U.S. Dist. LEXIS 84255, at *14-15 (N.D. Ind. Nov. 9, 2007). It is difficult to see how Linda relied upon these statements, made in January and February of 2009 to her detriment when she entered into the insurance contract in 1994. Once the statements were made, she had already agreed to the contract, and several months after they were made, she filed this lawsuit.

Thus, because Linda is required to plead claims of fraud with particularity and she has failed to identify any misrepresentation of past or existing fact that she relied on

to her detriment, MetLife's motion to dismiss Linda's claim of actual fraud is

**GRANTED** and this claim is **DISMISSED**. *See Am. Heritage Banco, Inc. v. McNaughton,*

879 N.E.2d 1110, 1116 (Ind. Ct. App. 2008) (affirming the trial court's decision to dismiss

a claim of actual fraud based on a broken promise); *Schafer v. Jeld Wen Doors,*

No. 2:07-cv-163, 2007 U.S. Dist. LEXIS 84255, at *11-13 (N.D. Ind. Nov. 9, 2007) (citing to

Fed. R. Civ. P. 9(b) and holding, "[t]he [p]laintiffs' fraud claim must be dismissed

because there is no false representation of a past or existing fact that is pled with

'particularity.'")

Similarly, Linda's claim of constructive fraud should also be dismissed because

she failed to plead with particularity that a special relationship existed between her and

MetLife or to identify specific misrepresentations upon which she relied to her

detriment. Linda argues that a claim of constructive fraud can be premised on future

promises, and thus she has a claim of constructive fraud which should not be

dismissed. (DE # 11 at 13.) MetLife incorrectly argues that Linda's claim of constructive

fraud must fail because claims of constructive fraud cannot be based on broken

promises and because Linda has not pled that a fiduciary or confidential relationship

existed between the parties. (DE # 12 at 10.)

The elements of constructive fraud are:

1) a duty existing by virtue of the relationship between the parties;
2) representations or omissions made in violation of that duty; 3) reliance
thereon by the complaining party; 4) injury to the complaining party as a
proximate result thereof; and 5) the gaining of an advantage by the party
to be charged at the expense of the complaining party.

19

*Wells v. Stone City Bank,* 691 N.E.2d 1246, 1250-1251 (Ind. Ct. App. 1998). Claims of constructive fraud can be based on future promises. *See Paramo v. Edwards,* 563 N.E.2d 595, 598 (Ind. 1990). The tort arises "when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud." *Wells,* 691 N.E.2d at 1250.

Again, the misrepresentations which Linda identifies for her fraud claims are: 1) that MetLife would waive premiums if Linda became disabled; 2) that it would not accept an SSA determination alone as proof of disability when the rider mentions no such prohibition; and 3) that Linda was required to pay for a physician to examine her when the policy said that as part of any proof MetLife "may require, at [its] expense, medical examinations of the insured by physicians" it named.[2] (DE # 1 ¶¶ 4, 20.)

First, the last two statements will not support a claim of constructive fraud. They cannot be seen to have induced Linda into entering the contract because they were made fifteen years after Linda entered into the contract with MetLife. Linda makes no allegation that she relied on those misrepresentations as required to state a claim of constructive fraud. Shortly after the second and third alleged misrepresentations were

_____

[2] Linda also makes a general allegation of misrepresentation: "Metropolitan Life, through its agent, Stephen A. Nardoza, made material misrepresentations of the [p]olicy with the knowledge that the representations were untrue or recklessly made and reliance on that representation by Linda to her detriment, which constitutes fraud." (DE # 1 ¶ 25.) However, this allegation does not meet the particularity standards of RULE 9(b) because it does not provide the "what" or "how" of the misrepresentation.

made, Linda brought this lawsuit. Even if Linda did rely on those statements, perhaps in delaying her lawsuit, she had no right to rely on MetLife's interpretation of the contract. The Supreme Court of Indiana has found that there is nothing that "entitles the insured, after a dispute has arisen, to rely upon the insuror's interpretation of the contract." *Travelers Indem. Co. v. Armstrong,* 442 N.E.2d 349, 364 (Ind. 1982). The insurer is under a duty not to make fraudulent representation and to act in good faith, but it has no duty to be correct. *Id.* While MetLife still had a duty to deal with Linda in good faith once the contract was made, that issue is more properly addressed by her claim for bad faith.

The second question is whether a claim of constructive fraud can be based on the alleged misrepresentation in the contract – that MetLife would waive the premiums if Linda became totally disabled. To begin, Linda has not sufficiently pled the existence of a special relationship required for constructive fraud. In order for a claim of constructive fraud to exist there must be "a duty owed by the party being charged with fraud to the complaining party due to their relationship." *Rice v. Strunk,* 670 N.E.2d 1280, 1284 (Ind. 1996). An arms-length, contractual relationship is not enough to give rise to a claim of constructive fraud. *See Morgan Asset Holding Corp. v. Cobank, ACB*, 736 N.E.2d 1268, 1278 (Ind. 2000); *Comfax Corp. v. North Am. Van Lines*, 587 N.E.2d 118, 126 (Ind. Ct. App. 1992) ("pure contractual relations between parties entering into an arm's length transaction may not form the basis for constructive fraud").

Still, a fiduciary relationship is not required for this duty to exist. *Wells,* 691 N.E.2d at 1251. This duty can arise when there is a buyer-seller relationship in which one party possesses "knowledge not possessed by the other and may thereby enjoy a position of superiority over the other," creating a duty of good faith and fair dealing. *Id.* Constructive fraud can exist when a future promise by one party induced the other party "to place himself in a worse position than he would have been in had no promise been made, and if the party making the promise derives a benefit as a result of the promise." *Farrington v. Allsop*, 670 N.E.2d 106, 109 (Ind. Ct. App. 1996). In these cases, the constructive fraud arises when "1) a seller makes unqualified statements to induce another to make a purchase; 2) the buyer relies upon the statements; and 3) the seller has professed to the buyer that he has knowledge of the truth of the statements." *Am. United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 702 (Ind. Ct. App. 2004).

Insurance contracts can potentially create the type of relationship upon which constructive fraud can be based. The Indiana Supreme Court has stated that the contractual relationship between an insurer and an insured is "at times a traditional arms-length dealing between two parties, as in the initial purchase of a policy, but is also at times one of a fiduciary nature," and sometimes it is an adversarial relationship. *Hickman*, 622 N.E.2d at 518-519. Regardless, the insured has an ongoing duty to deal in good faith with its insured. *Id. See Lake County Trust Co. v. Wine*, 704 N.E.2d 1035, 1039 (Ind. Ct. App. 1998). A claim of constructive fraud can arise from the creation of an insurance contract when the claim is based upon positive affirmations by the seller-

insurance agent to the potential insured. *Plohg v. NN Investors Life Ins. Co., Inc.*, 583 N.E.2d 1233, 1236 (Ind. Ct. App. 1992).

Linda does not make any specific allegations as to how a relationship that would give rise to constructive fraud existed between the parties here. The future promise to pay the disability was made when the contract was formed, at a time when the parties were engaged in an arms-length transaction as described in *Hickman*, so no fiduciary duty existed at that time. At the time the contract was made, the allegations establish that they were engaged in an arms-length relationship.

Further the statement that MetLife would waive the premiums if Linda became disabled does not seem to be the kind of representation that would establish a constructive fraud relationship between a buyer and seller. Instead it is a typical promissory statement made in the course of an arms-length negotiation. MetLife's statement that premiums would be waived in the event of total disability is not the type of unqualified statement that would show that it was used by MetLife to gain an advantage over Linda. *See Scott v. Bodor, Inc.*, 571 N.E.2d 313, 324 (Ind. Ct. App. 1991). It states that the insured must prove the total disability and MetLife must approve the claim. *See e.g.*, *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, No. 1:09-cv-340, 2010 U.S. Dist. LEXIS 29463 (S.D. Ind. Mar. 25, 2010) (stating that the types of statements needed to plead a claim of constructive fraud are affirmative, unqualified statements that profess special knowledge).

Even if MetLife did have a special duty towards Linda, she has not plead factual allegations supporting an inference that the representation made by MetLife violated its duty to Linda. Linda has not alleged that MetLife made the statement that it would waive the premiums in order to induce her into entering into the policy in 1994 or that it gained an advantage over her by adding this provision into the contract. In a related context, many states, following the RESTATEMENT (SECOND) OF TORTS (although Indiana does not, *see Peoples Trust Bank v. Braun*, 443 N.E.2d 875, 877 (1983)), allow for claims of actual fraud to be based on a statement of intent within a contract if at the time the contract was made the party making the representation had no real intention of following through on that statement of intent. *See* RESTATEMENT (SECOND) OF TORTS § 530 cmt. b (1977). A claim of actual fraud doesn't exist if the party making the statement later changes his/her mind or refuses to give effect to the stated intent. *Id.* In the context of constructive fraud, deceitful intent is not required. However, for a special relationship to exist and for that relationship to be violated, the speaker needs to have made the statements with the intent to induce the other party into the agreement and it needs to have gained an advantage over the other party through the representations. It follows that the intent to induce the other party into the agreement must have existed at the time the contract was made. Linda makes no allegations that give rise to an inference that at the time of the contract, MetLife made the statement that it would waive premiums in order to induce her into the contract.

Most importantly, Linda has failed to plead with particularity the factual

allegations to show that the statement of intent to waive the premiums in the contract support a claim of constructive fraud. The only allegations that Linda makes about the "who, what, where and when" of this misrepresentation is its inclusion in the rider as entered into in 1994. (DE # 1 ¶ 4.) She doesn't plead who made the misrepresentation on behalf of MetLife. In fact, she does not plead any factual allegations related to the negotiations that resulted in the creation of the policy. Thus, Linda has failed to plead with particularity that a claim of constructive fraud existed as to the first statement.

Therefore, MetLife's motion to dismiss Linda's claim of constructive fraud is **GRANTED** and that claim is **DISMISSED.**

### D.    *Intentional Infliction of Emotional Distress*

MetLife next argues that Linda's claim for intentional infliction of emotional distress should be dismissed for failure to state a claim upon which relief can be granted. The Indiana Supreme Court defined the perpetrator of the tort of intentional infliction of emotional distress as: "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind.1991). The elements of the tort are that the defendant "(1) engages in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another." *Id. See also Lindsey v. DeGroot*, 898 N.E.2d 1251, 1264 (Ind. Ct. App. 2009). The underlying basis for this tort is the intent to harm someone emotionally. *Cullison*, 570 N.E.2d at 31.

Indiana courts have been reserved in granting relief on claims of intentional infliction of emotional distress. *See Comfax Corp.,* 587 N.E.2d at 127-128; *Hamilton v. State Farm Mut. Auto. Ins. Co.,* IP 00-1718-C-T/K, 2002 U.S. Dist. LEXIS 7174, at *15 (S.D. Ind. Mar. 13, 2002) ("Using *Cullison* as a guide, Indiana courts have been very reluctant to recognize the tort of intentional infliction of emotional distress, and in fact, the Indiana Supreme Court has never been faced with a set of facts that states a claim for intentional infliction of emotional distress."). In light of this and a federal court's role of predicting what an Indiana court would do in state law matters, the Seventh Circuit has cautioned that it is not the place of federal courts "to expand the tort of intentional infliction of emotional distress further than the Indiana courts have already done." *McCreary v. Libbey-Owens-Ford Co.,* 132 F.3d 1159, 1167 (7th Cir. 1997).

MetLife argues that Linda's claim for intentional infliction of emotional distress should be dismissed because she has made no factual allegations of physical injury, her factual allegations will not support a claim that MetLife acted intentionally to harm her, and she has not identified any facts that would support a finding that MetLife's conduct was "extreme and outrageous." (DE # 8 at 10-11.) In response, Linda points out that physical harm is not required for a claim of intentional infliction of emotional distress. (DE # 11 at 15.)

The parties disagree about whether Linda is required to allege physical impact in addition to emotional distress in order to state a claim for intentional infliction of emotional distress. MetLife argues that Linda's claim for intentional infliction of

emotional distress should be dismissed because her complaint makes it "clear that she did not suffer an 'impact' as required by Indiana law." (DE # 12 at 11.) Generally a plaintiff can recover damages for emotional distress when they are accompanied by and resulting from a physical injury. (*Id.*) MetLife argues that the exception to this rule for intentional torts applies only when the tort is one that would "provoke a reasonably foreseeable emotional disturbance or trauma." (*Id.* (citing *Cullison*, 570 N.E.2d at 30).)

In fact, in a recent decision, the Indiana Supreme Court reaffirmed the physical impact requirement for claims involving negligence but noted that there is "an exception to the physical impact requirement for claims of intentional infliction of emotional distress." *Atl. Coast Airlines v. Cook,* 857 N.E.2d 989, 997-98 (Ind. 2006). Thus as long as Linda has stated a plausible claim that MetLife acted intentionally, her claim is not barred by failure to plead that her emotional distress arose from a physical injury.

Linda alleges that MetLife's conduct caused her severe emotional distress. (DE # 1 at 10.) Linda states that MetLife knew or should have known that its actions would cause her "extreme emotional injury, pain and suffering, and distress." (*Id.* at 5.) Although, Linda has not yet given much indication of what her emotional distress entailed, at this point, her allegations of severe emotional distress are sufficient.[3] A

---

[3] Indiana courts have indicated that a claim of intentional infliction of emotional distress will exist when the conduct at issue "causes mental distress of a very serious kind." *Lachenman v. Stice*, 838 N.E.2d 451, 457 (Ind. Ct. App. 2005). *See also Branham v. Celadon Trucking Serv.*, 744 N.E.2d 514, 523 (Ind. Ct. App. 2001); *Ledbetter v. Ross,* 725 N.E.2d 120, 124 (Ind. Ct. App. 2000). So far, Indiana courts have provided little guidance as to what constitutes a "serious kind" of emotional distress specifically for a claim of intentional infliction of emotional distress. However, Illinois courts, using a similar

cause of action for intentional infliction of emotional distress can exist when a

defendant acts recklessly. *See Cullison*, 570 N.E.2d at 31 (stating that the tort of

intentional infliction of emotional distress occurs when one's outrageous and extreme

conduct "intentionally or recklessly" causes severe emotional distress to another) (citing

RESTATEMENT (SECOND) OF TORTS § 46 (1965)). Indiana courts have interpreted

"recklessly" as the RESTATEMENT does - "deliberate disregard of a high probability that

emotional distress will follow." *Bradley v. Hall*, 720 N.E.2d 747, 753 n.6 (Ind. Ct. App.

1999).

Linda claims that in handling her claim, MetLife showed "a conscious disregard

of her rights under the [p]olicy, subjected her to cruel and unjust hardship, made

misrepresentations, and concealed material facts from Linda with the intention of

depriving her of the disability waiver of premiums under the [p]olicy." (DE # 1 ¶ 14.)

Again, Linda's factual allegations as to MetLife's intent to cause her emotional distress

are sparse, but they suffice at this time under the notice pleading standard to allow an

inference that MetLife intentionally acted to harm her.

---

standard, have determined that certain emotional states are not severe enough to allow
for recovery. *See Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 90 (Ill. 1976) ("Although
fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the
term 'emotional distress,' these mental conditions alone are not actionable."); *Johnson v.
K Mart Corp.*, 723 N.E.2d 1192, 1198 (Ill. App. Ct. 2000) (feelings of stress and fear
insufficient to support a claim of intentional infliction of emotional distress); *Welsh v.
Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1999) (anxiety and
humiliation not sufficiently severe to support  claim of intentional infliction of
emotional distress); *Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 942 (Ill. App. Ct.
1997) (fear and embarrassment, causing plaintiff to cry, not severe emotional distress).

What bars Linda's claim for intentional infliction of emotional distress is her failure to provide factual allegations that could plausibly give rise to an inference that MetLife's conduct was extreme or outrageous. Indiana courts have adopted the RESTATEMENT (SECOND) OF TORTS' approach to determining what type of conduct is sufficiently "extreme and outrageous" to impose liability under this tort. *Bradley v. Hall*, 720 N.E.2d 747, 753 (Ind. Ct. App. 1999) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965); *Gable v. Curtis*, 673 N.E.2d 805, 809-10 (Ind. Ct. App. 1996) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). It is not enough for a defendant to have "acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.* To be extreme and outrageous, conduct must go "beyond all possible bounds of decency" - the type of conduct "regarded as atrocious and utterly intolerable in a civilized society." *Lindsey,* 898 N.E.2d at 1264 -1265 (Ind. Ct. App. 2009).

In her complaint, Linda alleges that Metlife, through Nardoza, acted with "extreme and outrageous conduct that intentionally or recklessly caused severe emotional distress to Linda when the claim for disability waiver of premium benefit was denied and/or unreasonable [sic] delayed." (DE # 1 ¶ 27.) She alleges that by not waiving her payments of the premium, MetLife "knew or should have known that it would cause Linda financial harm, extreme emotional injury, pain and suffering, and

distress." (*Id.* ¶ 14.) She states that Metlife falsely accused her of not complying with her responsibilities under the policy even though she fully complied. (DE # 1 ¶ 20.)

In her briefing on the motion to dismiss, Linda argues that "the resulting mental trauma was and continues to be sufficiently outrageous to justify imposing liability on [d]efendant under notice pleading standards." (DE # 10 at 15-16.) Linda misstates the showing required for intentional infliction of emotional distress as it is the defendant's conduct, not the injury, that needs to be extreme and outrageous. Linda's statement that MetLife's conduct was "extreme and outrageous" is a legal conclusion that the court need not consider in ruling on the motion to dismiss.

The court needs to determine whether Linda's factual allegations can plausibly give rise to an inference that MetLife's actions were extreme and outrageous.  As Linda alleges, the rider stated that the insured must pay all premiums due until the claim is approved. (DE # 1 ¶ 4.) The policy required written notice and proof that total disability had existed continuously for six months and that as part of any proof, MetLife might require "at our expense, medical examinations of the insured by physicians we name." (*Id.*) In late November or early December, 2008, Linda called MetLife and advised it of her disability status. (*Id.* ¶ 7.) Once MetLife sent Linda a letter and forms related to her claim for waiver of premium benefits, she alleges that she filled out all of the forms and produced documentation of her disability status. (*Id.* ¶ 8.)

MetLife contacted Linda in January, 2009, and informed her that it needed medical proof of the total disability from the time that she became totally disabled. (*Id.*)

The letter stated that "MetLife does not accept Social Security, Worker's Compensation or any outside agency alone as proof of disability." (*Id.*) It also asked Linda to complete unanswered questions in her Statement of Claim and requested "[p]lease have the physician who has treated you during this period [June, 2008 to January 22, 2009] fully complete the enclosed medical statement." (*Id.*) Linda alleges that in response, she completed and returned the Statement of Claim. (*Id.* at 10.)

On February 20, 2009, MetLife sent Linda another letter which stated that it received a letter from her physician regarding the claim for disability benefits, but he indicated that he had not seen her since 2007. (*Id.* at 5.) MetLife's letter again stated that it needed medical proof of total disability from June, 2008 to February, 2009. The letter also stated, "[p]lease have a physician, who has treated you during this period, complete the enclosed form in full and return it to us in the enclosed envelope." (*Id.*) Linda makes no allegations concerning what she did after receiving this letter.

MetLife's conduct, as described above, cannot give rise to an inference that it acted beyond all possible bounds of human decency. Even if MetLife wrongfully rejected Linda's claims, nothing in the complaint could plausibly give rise to the conclusion that it acted atrociously and in a way totally unacceptable in society. In its January letter, MetLife asked for a statement from "the physician who treated" her since the time she was disabled. This statement gives rise to the inference that MetLife assumed that Linda, as someone who was totally disabled, had seen a doctor since the time of her determination of total disability and in the last six months. This was most

likely a reasonable assumption for MetLife to make and it certainly was not one that would go beyond all bounds of human decency.

In a case similar to the one at hand, a plaintiff brought a claim of intentional infliction of emotional distress against an insurance company for unreasonable delay and failure to pay her medical bills pursuant to an insurance policy and its implied implication that she was presenting an exaggerated or fraudulent claim. *Hamilton,* 2002 U.S. Dist. LEXIS 7174, at *15. In granting summary judgment to the defendant on this claim, the District Court for the Southern District of Indiana found that the alleged conduct was not extreme or outrageous to support a claim of intentional infliction of emotional distress. In this case, the policy states that MetLife has the right to approve a claim of total disability and to require proof. Even if MetLife breached the contract through the proof it required in this instance, it cannot be seen to have engaged in extreme and outrageous conduct by asking Linda to produce proof of disability beyond a statement of the SSA's determination and the statement of doctor who had not seen her since 2007.

Further, Linda's complaint could possibly give rise to the inference that given the ambiguity in the contract as to who would pay for an additional physical examination if needed, MetLife acted unreasonably in not immediately stating in its February 2009 letter that it would pay for a physician to exam Linda in order to have the medical statement form completed. The court notes that it's not clear that MetLife did not intend to pay or that it didn't assume that Linda could get this statement without additional

cost to her from a doctor who had treated her in the previous six months. Linda does not allege that she and MetLife had any communication whatsoever after her receipt of the February 2009 letter. However, taking Linda's complaint as true, MetLife's conduct in not immediately offering to pay for the examination could be seen as unreasonable and in breach of the contract.

Even so, these factual allegations do not plausibly give rise to a scenario in which MetLife's conduct was extreme and outrageous. Courts have found that defendants can act unreasonably without acting in an extreme and outrageous manner. *See Gable v. Curtis*, 673 N.E.2d 805, 810-11 (Ind. Ct. App. 1996) (finding that while defendant's seven phone calls to the plaintiff may have been unreasonable and abusive, they were not extreme and outrageous). *Cf. Karkomi v. Am. Airlines*, 717 F. Supp. 1340, 1345 (N.D. Ill. 1989) (finding that while American Airlines may have "bizarrely" and possibly improperly barred plaintiffs from boarding a plane for which they had tickets and allowing a breach of contract claim to go forward, plaintiffs' claim of intentional infliction of emotional distress claim should be dismissed because the airlines' behavior did not exceed all possible bounds of decency). Therefore, MetLife's motion to dismiss Linda's claim for intentional infliction of emotional distress pursuant to RULE 12(b)(6) is **GRANTED**.

E.      *Consortium*

Finally, MetLife moves to dismiss James Skinner's claim for loss of consortium. To support his claim, James alleges that he and Linda were married at the time of the

incident in the complaint and continue to be married. (DE # 1 at 11.) He states that "as a result of the wrongful and negligent acts of Metropolitan Life, he was caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection, and conjugal fellowship, all to the detriment of her [sic] marital relationship with Linda." (*Id.* at 12.)

MetLife makes only one argument to support its request that James' claim be dismissed. This argument is that because loss of consortium claims are derivative of a spouse's underlying tort claim and they cannot stand on their own if the underlying tort claim fails on its merits. *See Watters v. Dinn*, 666 N.E.2d 433, 438 (Ind. Ct. App. 1996). Therefore, it argues that because Linda's tort claims must be dismissed, then James' claim must be dismissed. (DE # 8 at 11; DE # 12 at 14 n. 5.)

However, as established above, the court has declined to dismiss Linda's tort claim for bad faith. James will need to show that some injury inflicted upon Linda by MetLife's commission of a tort caused him a loss of consortium. *See Board of Comm'rs v. Nevitt*, 448 N.E.2d 333, 341 (Ind. Ct. App. 1983). Here, Linda alleges that she suffered emotional distress from MetLife's actions, and if she prevails on her claim of bad faith, she may be able to recover for emotional distress. *See e.g., O'Boy v. State Farm Mut. Auto. Ins. Co.*, No. 2:04-cv-441, 2006 U.S. Dist. LEXIS 42302, 11-12 (N.D. Ind. June 13, 2006) ("this court agrees with *Patel* which concluded that traditional tort injuries, such as emotional distress, are available to plaintiffs who prevail on bad faith claims under Indiana law"). Thus, from the allegations in the complaint it is plausible that James

could have a claim of loss of consortium based on Linda's injuries under her claim of bad faith, and MetLife's motion to dismiss James' claim of loss of consortium is **DENIED.**

## IV.    CONCLUSION

For the foregoing reasons defendant's motion to dismiss (DE # 7) is **DENIED** in part and **GRANTED** in part. The motion to dismiss the claims for actual fraud, constructive, and intentional infliction of emotional distress is **GRANTED** and those claims are **DISMISSED**. The motion to dismiss the claim of breach of contract, bad faith, and loss of consortium is **DENIED**. The case will proceed on these claims. Plaintiffs' motion to strike defendant's reply brief (DE # 13) is **DENIED**.

**SO ORDERED.**

Date: May 27, 2010

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT